UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DAVID P. READ,                                      :
                                Plaintiff,    :         10 Civ. 9042 (JPO)
                                       :
                   -v-                    :         MEMORANDUM AND
                                       :                  ORDER
TOWN OF SUFFERN POLICE DEPARTMENT, :
*et al.*,                                                     :
                                Defendants.   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

     *Pro se* Plaintiff David Paul Read, currently detained at Attica Correctional Facility, brings this civil rights action pursuant to 42 U.S.C. § 1983 against the Town of Suffern Police Department, Officer Michael Lourenso, Officer James Giannetino, Detective Raymond Sheehan, Sgt. John Glodie, and Sgt. David Tarritino, alleging false arrest, failure to provide proper medical treatment, and excessive force in violation of his Fourth and Eighth amendment rights, in connection with his arrest in violation of a restraining order.[1]  Defendants have moved for summary judgment on all of Plaintiff's claims under Fed. R. Civ. P. 56.  For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

**I.**    **Background**

       **A.**    **Factual Background**

     The following facts are drawn from Plaintiff's complaint, the parties' Local Rule 56.1 statements, depositions, and other materials submitted in connection with the instant motions. These facts are undisputed unless otherwise noted.

---

[1] Plaintiff initially brought claims against several other defendants.  These claims were dismissed by the Court *sua sponte* at the commencement of the litigation.  (*See* Dkt. No. 11.)

The claims in this action arise out of two separate events, the first on April 27, 2009, and the second on April 28, 2009.

### 1. The Events of April 27, 2009

Plaintiff has been married to Michelle Surdak-Read ("Surdak") for fourteen years. (Dkt. No. 10 ("Mastellone Decl."), Ex. C ("Read Dep."), at 6:20.) During the period in question, the two shared an apartment. (*Id.* at 34:3.) On August 30, 2006, an order of protection was issued on Surdak's behalf against Plaintiff. (Mastellone Decl., Ex. D.)[2] The order of protection was set to expire on August 29, 2009. (*Id.*)

On April 27, 2009, Surdak called the police from her car, stating that Plaintiff had threatened her. (Pl. Ex. 14 ("Tr. Trans."), at 36-37.) Shortly after 10 p.m., Officer Giannetino was radioed by dispatch and sent to Plaintiff and Surdak's apartment. (*Id.* at 10.) When Giannetino arrived, Surdak confirmed that Plaintiff had threatened her. (Dkt. No. 132 ("Lourenso Decl.") at ¶ 3.) She also reported having an order of protection against Plaintiff.

Surdak let herself and Giannetino into her apartment building, and the two were then joined by Officer Lourenso. (Trial Tr., at 13:7.) When Surdak was unable to open the apartment door with her key, she knocked and called out for Plaintiff. (*Id.* at 13:18.) Plaintiff opened the door, and the officers entered with Surdak behind them. (*Id.* at 13:21-23.)

While Lourenso interviewed Plaintiff, Giannetino confirmed through radio dispatch that there was indeed an outstanding order of protection. (Lourenso Decl. at ¶ 4.) Plaintiff argued that the order was no longer valid, and attempted to gather corroborating papers from his briefcase. (Read Dep. at 39:4.) When Plaintiff was unable to collect the relevant papers,

---

[2] The order of protection required Plaintiff to refrain from generally stalking or harassing Surdak, but did not require Plaintiff to stay away from Surdak altogether.

Lourenso performed a pat down search.  According to the officers, at this point, Plaintiff called his wife a "pig" and threatened to kill her. (Lourenso Decl. at ¶ 5.)

Plaintiff was taken to Giannetino's squad car and transferred to the Suffern Police station. (*Id*. at ¶ 6.)  After arriving at the station, Plaintiff was placed into a holding cell. (Trial Tr. at 12:20.)  Approximately fifteen minutes later, Surdak entered the station and was brought into the squad room. (*Id.* at 18:21.)  Plaintiff reportedly continued to threaten Surdak from his holding cell. (*Id.* at 19:8.)

Shortly after Surdak's departure from the station, Plaintiff had an anxiety attack and repeatedly asked for his medication. (Read Dep. at 47:5.)  The requested medication was in Plaintiff's black bag, which had been brought to the station by Lourenso. (*Id* at 52:11-13.) When the officers responded that they could not provide Plaintiff with the medication while he was detained, Plaintiff claimed to have suicidal thoughts and asked to be taken to the hospital. (*Id* at 54:16.)  Sergeant Glodie and Officer Giannetino complied with Plaintiff's request, calling the paramedics and accompanying Plaintiff to Good Samaritan Hospital. (*Id.* at 54:21-23.)  At the hospital, Plaintiff briefly spoke to a doctor. (*Id.* at 55:14.)  Plaintiff claims that, during this conversation, Glodie told the doctor not to prescribe anything since Plaintiff was under arrest and could not receive medication while detained. (*Id.* at 55:19.)  According to Plaintiff, Glodie then told the doctor "[t]o hurry up with his paperwork." (*Id.*)  Plaintiff was signed out shortly thereafter, and returned to Suffern Police Station and his holding cell. (*Id.* at 56:15-18.)

### 2. The Events of April 28, 2009

At approximately 12 p.m. the next day, Plaintiff began yelling that he needed his medication due to another panic attack. (Read Dep. at 59:4.) Shortly thereafter, Plaintiff claims that his toilet clogged and his cell began to flood. (*Id.* at 59:14-15.)[3]

After his cell flooded, Plaintiff was removed from his cell and handcuffed to a railing in a reversed-seated position. (Read Dep. at 60:22-24.) Apparently still panicking, Plaintiff attempted to retrieve his black bag from a nearby storage locker in order to obtain his medication. Plaintiff claims that he was tased by Lourenso before he could reach his bag. (*Id.* at 61:20-22.) Defendants claim that the tasing was done entirely by Officer Tarritino; indeed, they assert that Lourenso was not even present when the tasing occurred. Moreover, according to Tarritino, Plaintiff was tased not when he reached for his bag, but after he had successfully pulled out his medication and had ingested some of his pills. (Tarritino Decl. at ¶ 9.) In any event, after the first tasing, Plaintiff claims he collapsed "with his body uncontrollable." (Pl. Rep. at 3.)

According to Plaintiff, Officer Tarritino then grabbed Lourenso's taser and continued to shock him, exclaiming, "How do you like this, motherfucker? How does this feel? I'm going to roast your ass." (Read Dep. at 62:7.) Tarritino denies gratuitously tasing Plaintiff. (Tarritino Decl. at ¶ 13.) He claims that Plaintiff was tased to protect both himself and those officers present. (*Id.*) Plaintiff was not taken to the hospital after being tased. Plaintiff cannot "substantiate any physical injuries" from the incident. (Read Dep. at 103:23-104:8.)

---

[3] The officers tell a different story. According to them, Plaintiff tore up and tied his standard-issued blanket around the cell doors. (Dkt. No. 142 ("Tarritino Decl.") at ¶ 4.) Plaintiff then allegedly retrieved a green plastic soda bottle from his cell, shredded it, and motioned as if he would cut himself with the pieces. (*Id.* at ¶ 5.) The officers then claim that Plaintiff plugged up the toilet himself, purposely causing his cell to flood. (*Id.* at ¶ 7.)

Immediately following these events, Plaintiff was arraigned. (*Id.* at 65:3-4.) In December 2010, Plaintiff was convicted in a jury trial for criminal contempt in the first degree for violating the order of protection. (Mastellone Decl., Ex. E.) He unsuccessfully appealed this judgment. *See People v. Read*, 97 A.D.3d 702 (2d Dep't 2012), *leave to appeal denied*, 978 N.E.2d 113 (2012).

## II. Legal Standard

### A. Summary Judgment

A court may not grant a motion for summary judgment unless all of the parties' submissions, read together, reveal that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wright v. Goord,* 554 F.3d 255, 266 (2d Cir. 2009). The moving party bears the burden of proving that there is no genuine difference of material fact. *Zalaski v. City of Bridgeport Police Dep't.*, 613 F.3d 336, 340 (2d Cir. 2010). In contrast, the non-movant benefits from a court's construction of all facts, and the resolution of all ambiguities, in its favor. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). A fact is "material" only if it will affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When there is no evidence in the record "from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact," summary judgment is proper. *Catlin v. Sobol,* 93 F.3d 1112, 1116 (2d Cir. 1996).

While a court must construe the facts "in the light most favorable" to the non-movant, *id.*, it must also "dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, courts must deny a motion for summary judgment where reasonable jurors could disagree as to the proper result. It bears mentioning, however, that "[t]he

5

mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

### B. Construction of Pro Se Submissions

*Pro se* submissions are to be construed liberally and thus should be read to raise the strongest argument that they suggest. *Cruz v. Midwood Ambulance & Oxygen Serv., Inc.,* 136 F. Appx. 414, 415 (2d Cir. 2005) (citing *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994)). "The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims." *Id.* (citing *Weixel v. Bd. of Ed.,* 287 F.3d 138, 146 (2d Cir. 2002)). Nevertheless, even where the non-movant is *pro se*, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

### C. Qualified Immunity

Where police officers are sued in their individual capacities for alleged rights violations, they are entitled to qualified immunity with respect to certain discretionary actions. *Cerrone v. Brown*, 246 F.3d 194, 198-99 (2d Cir. 2001). An officer is immune from suit, and accordingly, from civil liability, if *either* (1) "his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,'" *id.* at 199 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)), *or* (2) "it was 'objectively reasonable for him to believe that his actions were lawful at the time of the challenged act,'" *id.* (quoting *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Anderson v. Creighton,* 483 U.S. 635 (1987)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from

harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

An officer's subjective beliefs and motivations are irrelevant to the qualified immunity analysis. *See Lennon*, 66 F.3d at 423. Instead, courts decide only whether a jury could find that "'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* at 420 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Importantly, while summary judgment demands that all facts be construed in the light most favorable to the non-movant, courts consider whether the officers made "reasonable inferences from the facts they possess[ed] at the time of [the alleged violation] based upon their own experiences." *Cerrone*, 246 F.3d at 203 (citing *Ornelas v. United States,* 517 U.S. 690, 699 (1996)). If a genuine issue of material fact exists regarding the reasonableness of the officers' conduct, summary judgment must be denied. *See Azrielli v. Cohen Law Offices*, 21 F.3d 512, 516 (2d Cir. 1994). Finally, "[q]ualified immunity is an affirmative defense." *Lee v. Sandberg,* 136 F.3d 94, 101 (2d Cir. 1997). Accordingly, the burden rests on the officers "to raise the defense in their answer and to establish the defense on a motion for summary judgment." *Id*. (citing *In re State Police Litigation,* 88 F.3d 111, 123 (2d Cir. 1996)).

### III.   Discussion

#### A.   Claims against the Suffern Police Department

At the outset, summary judgment must be granted in favor of Defendants with respect to all claims against the Suffern Police Department. In determining whether the arm of a municipality may be sued, courts look to state law. Fed. R. Civ. P. 17(b)(3). Under New York law, "departments which are merely administrative arms of a municipality," as is the case here, "do not have a legal identity separate and apart from the municipality and cannot sue or be sued."

*Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. January 25, 2002) (citations omitted). Thus, summary judgment is granted as to the claims against the Town of Suffern Police Department.[4]

### B. Claims against Detective Raymond Sheehan

Summary judgment must also be granted in favor of Detective Raymond Sheehan. Nowhere does Plaintiff allege that Sheehan was involved in any of the events that took place regarding this suit. Thus, all claims against Sheehan are dismissed. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983" (citation omitted)).

### C. False Arrest Claims

Plaintiff alleges that Officers Lourenso and Giannetino violated his Fourth Amendment rights by falsely arresting and incarcerating him. To prevail on a false arrest claim, a plaintiff must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier,* 316 F.3d 128, 134-35 (2d Cir. 2003) (citation and quotation marks omitted). The presence of probable cause "is a complete defense to an action for false arrest." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994); *see also Singer v. Fulton County Sherriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause.") To receive qualified

---

[4] Nor is there evidence that any of the alleged constitutional violations stem from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the town of Suffern. *Monell v. Dep't of Social Services of the City of New York*, 436 U.S. 658, 690 (1978); *see also id*. at 690-95 (explaining that local governments cannot be held liable for the acts of their employees under the doctrine of *respondeat superior*). Thus, even were the Court to construe Plaintiff's claim against the Suffern Police Department as against the town of Suffern, it would nonetheless fail.

immunity, officers need only have "'arguable' probable cause." *Cerrone*, 246 F.3d at 202. "Arguable" probable cause is met when "a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Lee*, 136 F.3d at 102 (emphasis in original). Thus, an arresting officer is "entitled to summary judgment on qualified immunity grounds if [his] actions were not objectively unreasonable at the time they were taken," meaning *either* "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Id.* at 102.

Probable cause "is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir. 2006) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)). "Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citations omitted).

Here, it is beyond genuine dispute that the officers had probable cause to arrest Plaintiff. Surdak informed the police that Plaintiff was threatening her and that he had violated an order of protection. Nor does Plaintiff dispute that he continued to threaten Surdak in the officers' presence. Finally, dispatch confirmed that there was a valid order of protection against Plaintiff. Given this confluence of circumstances, the arresting officers reasonably believed that they possessed probable cause to detain Plaintiff.

Plaintiff argues that the order of protection was no longer valid. Yet even if the order of protection had been nullified, the officers acted reasonably in arresting a man alleged to have threatened his wife in a domestic dispute. Moreover, the officers had "reasonably trustworthy information" regarding the restraining order—it had been confirmed by police dispatch. More importantly, Plaintiff was eventually convicted for violating the protective order, and his conviction was affirmed on appeal. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("If, following the arrest, the plaintiff was convicted of the charges against him, that conviction normally would be conclusive evidence of probable cause . . . if the conviction survives appeal." (internal quotation marks and citations omitted)); *see also Cameron v. Fogarty,* 806 F.2d 380, 387 (2d Cir. 1986) ("[E]ven if no probable cause existed at the time of arrest, . . . a suit for false arrest may not normally be maintained if the arrest was followed by conviction, regardless of the validity of the arrest at the time it was made." (internal quotation marks and citations omitted)). Given Plaintiff's threats to his wife, police dispatch's confirmation of the warrant's validity, and the upholding of Plaintiff's conviction on appeal, probable cause existed as a matter of law. *See Lee*, 136 F.3d at 102.

Accordingly, Plaintiff's false arrest claim is dismissed.

### D. Failure to Treat Claims

Plaintiff alleges that Officers Giannetino and Glodie violated his rights by failing to supply him with anxiety medication and refusing his request for treatment after he was tased. If Plaintiff was an inmate, his deliberate indifference claims would be rooted in the Eighth Amendment, *see City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983), but since Plaintiff was a pre-trial detainee, his claim is governed by the Fourteenth Amendment, *id.* This distinction, however, is academic: "While the Eighth Amendment may not, strictly

10

speaking, be applicable to pretrial detainees," claims by detainees under the Fourteenth Amendment are analyzed under the same standard. *Arroyo v. Schaefer*, 548 F.2d 47, 50 (2d Cir. 1977) (citation omitted).

The test for deliberate indifference under either the Eighth or the Fourteenth Amendment contains both an objective and a subjective component. *Hudson v. McMillian*, 503 U.S. 1, 21 (1992); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir. 1998). "The objective component requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation and internal quotation marks omitted); *but see Smith v. Carpenter*, 316 F.3d 178 (2d Cir. 2003) ("Because the objective component of an Eighth Amendment claim is . . . necessarily contextual and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." (internal quotation marks, citations and alterations omitted)). To satisfy the subjective component, a plaintiff must demonstrate that the defendant "act[e]d with a sufficiently culpable state of mind"—that he was aware of and purposely disregarded Plaintiff's objectively serious medical needs. *Hudson*, 5603 U.S. at 8 (citation and internal quotation marks omitted). The Second Circuit has analogized this element to the standard of "recklessness" in criminal law. *See Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002). In sum, an official cannot be held liable for deliberate indifference of medical needs unless he or she "knows of and disregards an excessive risk to" the detainee's health or safety, or "was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### 1. The Anxiety Attacks

Defendants were not deliberately indifferent to Plaintiff's anxiety attacks. Officers Giannetino and Glodie did not ignore Plaintiff's pain, but rather, shortly after his complaints began, escorted him to Good Samaritan Hospital to be evaluated. It is undisputed, in other words, that the officers quickly responded to his repeated requests for aid. Furthermore, there is no evidence that, once Plaintiff was at Good Samaritan, the doctor denied him full and fair treatment. Plaintiff claims that his care was rushed, but the Constitution entitles one only to adequate medical care, not to the "type or scope of medical care which he personally desires." *Garcia v. Senkowski*, 919 F. Supp. 609, 615 (N.D.N.Y. 1996) (quoting *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 867 (2d Cir. 1970)); *see also Alston v. Bendheim*, 672 F. Supp. 2d. 378, 385 (S.D.N.Y. 2009) ("An inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment do not support a claim of cruel and unusual punishment." (citation omitted)). Since no evidence exists to create a genuine dispute that the officers were deliberately indifferent to Plaintiff's needs, summary judgment is granted in their favor as to this claim.[5]

### 2. The Tasing

Plaintiff next claims that he was unconstitutionally denied medical care after he was tased. Here, Plaintiff has not satisfied the objective prong of the objective prong of the deliberate indifference test, as Plaintiff's alleged injuries are insufficient to prove a denial of medical treatment claim. While Plaintiff states he was in pain from the tasing, he names no particular

---

[5] The Court need not reach the objective prong here, as Plaintiff clearly fails to satisfy the requisite subjective prong. It is worth noting, however, that Plaintiff's anxiety attacks were likely not sufficiently serious to satisfy the objective component of the "deliberate indifference" analysis.

medical need arising from this event. Furthermore, Plaintiff provides no medical information to support this possibility. Since Plaintiff does not allege any "sufficiently serious" injury requiring professional treatment, he has failed to create a genuine dispute of material fact as to his second failure to treat claim.

## B. Excessive Force Claim

Finally, Plaintiff alleges that his tasing at the hands of Officers Lourenso and Tarrattino constitutes excessive force. "Claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). *But see United States v. Walsh*, 194 F.3d 37, 48 (1999) (using an Eighth Amendment "cruel and unusual" analysis in an excessive force claim by a pretrial detainee against a correctional officer in a jail). "[T]he reasonableness question is whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2012) (citation omitted). Importantly, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," so as to allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97 (citation omitted).

"It is well established that qualified immunity may operate as a defense to excessive force claims." *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002 (S.D.N.Y. Jan. 3,

2013) (citing *Finnegan v. Fountain,* 915 F.2d 817, 822-23 (2d Cir. 1987)).  At the same time, "[i]t is beyond dispute that the right to be free from excessive force has long been clearly established."  *Green v. Montgomery*, 219 F.3d 52, 59 (2d Cir. 2000) (citation omitted).  Thus, in the excessive force context, "the question for the purposes of qualified immunity is 'whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.'"  *Lennon*, 66 F.3d at 425 (quoting *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir. 1994)).

### 1.     Officer Lourenso

Officer Lourenso denies that he was present when Plaintiff was tased.  Yet even if Plaintiff's version of the story is true and Lourenso conducted the initial tasing, Plaintiff's claim of excessive force falls short.  Given Plaintiff's behavior, it was reasonable for Lourenso to believe that he might harm himself or others.  Immediately prior to being tased, Plaintiff was both acting manically and reaching inside a contraband item only a few feet away.  It was entirely reasonable for the officers to believe that Plaintiff might pull something more dangerous from the bag than his pills.  Even if Plaintiff only grabbed his pills, his prior suicidal threats gave the officers reason to restrain him as quickly as possible.

Plaintiff argues that Defendants could have less aggressively restrained him or removed the bag from his possession.  Perhaps so.  But courts must be hesitant in judging such split-second decisions, especially in such a tense and uncertain situation.  *See Graham*, 490 U.S. at 396-97.  Given Plaintiff's potential harm to himself and the officers, the undisputed evidence establishes that the initial decision to tase Plaintiff does not constitute excessive force.

### 2. Officer Tarritino

The second tasing is another matter. Plaintiff states that after the initial tasing, Officer Tarritino grabbed the taser from Lourenso and continued to shock Plaintiff, remarking that he was going to "roast" him. Construing the facts in light most favorable to Plaintiff, this second tasing constitutes a viable claim of excessive force. In his declaration, Tarritino curtly testifies that he acted to prevent Plaintiff from causing further harm to himself or others. According to Plaintiff, however, the initial tasing rendered him immobile. It is hard to image how a man tied to a railing and temporarily paralyzed could continue to pose a danger to himself or the officers. Again, the Court recognizes, and respects, that police officers are forced to make quick judgments in difficult situations. *Graham*, 490 U.S. at 396-97. Nonetheless, the present record fails to demonstrate how it was objectively reasonable to continue shocking Plaintiff after he had collapsed. *Accord Towsley v. Frank*, No. 09 Civ. 23, 2010 WL 5394837, at *7-10 (D. Vt. Dec. 28, 2010) (officer was justified as a matter of law in tasing plaintiff initially, but material facts precluded summary judgment on the second tasing while plaintiff was lying on the sidewalk).

According to Defendants, Plaintiff's inability to prove that he sustained any injuries disqualifies his excessive force claim. *See Santiago v. C.O. Campisi Shield No. 4592*, 91 F. Supp. 2d 665, 674 (S.D.N.Y. 2000) (noting that de minimus physical contact is not cognizable under the Eighth Amendment). In the Fourth Amendment context, however, it is the officer's unreasonable conduct, and not the injuries that result, which is of critical importance. Of course, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' . . . violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir. 1973)). Needless to say, however, a taser to the back is not a "non-serious or trivial use of force" akin to a shove; rather, it is a "serious intrusion into the

15

core of the interests protected." *Towsley*, 2010 WL 5394837, at *8 (quoting *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010)); *see also Bryan v. MacPherson*, 630 F.3d 805, 810 (9th Cir. 2010) (describing use of a taser as an "intermediate, significant level of force that must be justified by the governmental interest involved" (citation omitted)); *cf. Mes*a, 2013 WL 31002, at *20 (S.D.N.Y. Jan. 3, 2013) (noting that "bruises or even fleeting pain, such as that which [the defendant][] claims she experienced during her arrest, *may* give rise to an excessive force claim"). Since it remains unclear whether Officer Tarritino's use of force was objectively reasonable and serious injury need not be shown here, summary judgment on Plaintiff's excessive force claim as to the second tasing is denied.

## IV.     Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. The excessive force claim against Officer Tarritino survives summary judgment. Plaintiff's other claims are dismissed.

The Clerk of the Court is directed to close the motions at Docket Numbers 131 and 134.

SO ORDERED.

Dated: New York, New York
       June 25, 2013

_____
J. PAUL OETKEN
United States District Judge